FILED

2012 Nov-19  AM 10:49
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN  DIVISION**

| |
|---|
| **RICHARD BRAZIL,** |
| |
|     **Plaintiff,** |
| |
| **v.** |
| |
| **VOLKERT, INC.,** |
| |
|     **Defendant.** |

**2:11-CV-3943-KOB**

**MEMORANDUM OPINION**

This matter comes before the court on Defendant Volkert Inc.'s Motion for Summary

Judgment. (Doc. 13). Plaintiff Richard Brazil claims that Volkert violated the Age

Discrimination in Employment Act when it terminated his employment and that it violated the

Fair Labor Standards Act when it did not pay him overtime for hours worked in excess of forty

hours per week. Volkert claims that Mr. Brazil cannot establish a prima facie case of age

discrimination because he does not have sufficient direct or circumstantial evidence to prove he

was terminated because of his age. Volkert also claims that it did not have to pay Mr. Brazil

overtime because he was an exempt salaried employee under the FLSA.  Because genuine issues

of material fact exist concerning both of Mr. Brazil's claims, the court will DENY summary

judgment.

I.    STATEMENT OF FACTS

    A.    Factual History

Volkert, Inc. is an engineering, planning, and environmental consultation firm that has

1

been operating since 1925. Volkert employed Mr. Brazil as a "Right of Way Consultant/ Real

Estate Specialist" ("Real Estate Specialist") from 1998 until December 1, 2010. The day-to-day

activities of Real Estate Specialists like Mr. Brazil are guided by the Uniform Relocation Act and

its implementing regulations, codified at 29 C.F.R. Part 24. The URA sets forth policies and

procedures that public agencies must meet when relocating and compensating individuals

displaced by public works projects.  The URA allows for a relocation/ replacement housing

benefit if the displaced person is entitled to replacement housing. This benefit is calculated by

identifying comparable properties and subtracting the value of the acquired property from the

price of the comparable property.

In his capacity as a Real Estate Specialist, Mr. Brazil aided in relocating persons

displaced by public works projects contracted by Volkert's clients. Mr. Brazil alleges that

displaced individuals were responsible for selecting their own replacement property and that he

only provided "advisory assistance" to them, but Volkert claims that Mr. Brazil actually aided

these displaced individuals in finding replacement housing. (Doc. 17, at 10). Undisputably, Mr.

Brazil obtained moving estimates, ensured the timeliness of relocations, attended real estate

closings, applied for the displaced individuals' payments from the relevant state authority, and

conducted "decent, safe, and sanitary" ("DSS") inspections of the proposed replacement

properties. The DSS inspections consisted of walking through the replacement property that the

person wanted to purchase and making checks on a preprinted form. Volkert asserts that Mr.

Brazil exercised independent judgment and discretion in completing these sometimes

complicated inspections.

Mr. Brazil also selected comparable properties for the displaced individuals who were

trying to find replacement housing, but he did not perform appraisals of the comparable properties himself. The parties dispute what the actual process for finding comparable properties was; Mr. Brazil claims that it was "simply a matter of making lists and sorting them according to objective information provided by the appraiser and the information captured in the MLS [Multiple Listing Service] listings of properties on the market." (Doc. 17, at 1-2). Volkert claims that Mr. Brazil conducted extensive on-site evaluations of "numerous" properties by referencing the MLS listings and then "selected" the property that he viewed as most comparable to the taken property. (Doc. 13, at 2).  In making his assessment, Volkert claims that Mr. Brazil would visit the properties, take pictures, record data, and draw a sketch of the comparable property. If the taken property was a mobile home, Volkert claims that Mr. Brazil's job became "much more difficult" and complicated because often times the ownership of a mobile home is divorced from the ownership of the land on which the mobile home sits. (Doc. 13, at 2).  In compiling and selecting a comparable property, Volkert claims that Mr. Brazil had to analyze and make choices "based on an inherent level of discretion in the process." (Doc. 13, at 2). Mr. Brazil was not involved in recommending to the client whether a reasonable compromise was likely or whether the client should pursue further negotiations or a condemnation action.

For each comparable property inspection, Mr. Brazil completed a "Replacement Property Inspection Report" that contained a paragraph stating, "[I]n my opinion, [the proposed replacement dwelling] does meet the standards for decent, safe, and sanitary housing, and [I] do hereby further certify that the replacement property is subdivided into sufficient rooms to accommodate the displacee." (Doc. 13, at 3).  Volkert claims that Right of Way Consultants make decisions in which they have to exercise independent judgment to make sure projects are

finished on time, but Mr. Brazil claims that this characterization of his job lacks foundation. Sandy Harmening, Volkert's Assistant Vice President of the Real Estate Division, testified that she did not have any oversight of Mr. Brazil's or any other Real Estate Specialist's day-to-day activities. (Doc. 13-6, at 204).

Sometime in 2007, Volkert assigned Mr. Brazil as Project Manager in Huntsville, Alabama. Mr. Brazil claims that as Project Manager, his only additional duties were completing weekly status reports and purchasing office supplies. Mrs. Harmening, however, testified that Project Managers are "the main spokesman with the client" on the project to which they are assigned. (Doc. 13-6, at 207-10).

Prior to August 2010, Mr. Brazil was working on two projects, both in Mississippi, and working out of an office in Hernando, Mississippi. Mr. Brazil commuted weekly from Birmingham, his home, to Hernando, a drive of about four-and-a-half hours. Mr. Brazil claims that arthritis in his right hip sometimes caused him pain on the drive to and from Hernando, but he was always able to make the drive despite the discomfort. No doctor restricted Mr. Brazil's driving or activity because of his arthritis. Mr. Brazil even admitted to sometimes driving to and from Hernando in one day, a drive of around nine hours.

Mr. Brazil testified that he worked forty hour weeks but also responded to an interrogatory by saying that he believed he "worked more than forty hours per week in numerous pay periods between May 2009 and July 2010." (Doc. 13-1, at 86; Doc. 18-2, at 8). Volkert admits that Mr. Brazil worked in excess of forty hours during certain weeks and that at no point during his employment with Volkert was Mr. Brazil paid for hours in excess of forty per week. (Doc. 18-3, at 30). Brazil never complained about not being paid overtime while employed by

4

Volkert, and he knew that he was a salaried employee while at Volkert. The parties do not dispute that "at certain times in [Mr. Brazil's] employment, [Volkert] did not pay [Mr. Brazil] his regular salary-derived hourly rate of pay for hours he worked in excess of forty hours per week." (Doc. 18-3, at 30). Mrs. Harmening testified that the Real Estate Services Department follows its handbook's dictate that "all the week's hours must be accounted for accurately." (Doc. 13-6. At 33).

A few months prior to Mr. Brazil's termination, David Bell, Vice President of Volkert, requested Mr. Brazil begin working on a project in New Orleans because Volkert had no other work for Mr. Brazil to do. Volkert claims that Mr. Brazil flatly refused to work in New Orleans because he was concerned about the drive, but Mr. Brazil claims that he would have been fine working in New Orleans if Volkert was willing to reasonably accommodate his travel to and from New Orleans. Mr. Brazil claims that he discussed the possibility of working out of the Mobile, Alabama, office and commuting to New Orleans as needed, but Volkert claims that it never needed additional people in Mobile and did not consider Mr. Brazil working out of Mobile. Mr. Bell's testimony and Mr. Brazil's testimony about the discussions that occurred concerning Mr. Brazil's working in New Orleans differs greatly, and the parties hotly dispute what exactly was said about accommodating Mr. Brazil's commute to and from New Orleans.

Volkert claims that it told Mr. Brazil New Orleans was the only work it had for him and that it would be willing to fly Mr. Brazil to and from New Orleans every other weekend because he was a valued employee and it wanted to work with him. Volkert then asserts that Mr. Brazil did not have any interest in flying back and forth even though Volkert told him it was already flying another employee on the same schedule to New Orleans from Birmingham. Mrs.

Harmening testified that Mr. Brazil was "adamant about not going to New Orleans." (Doc. 13-6, at 129). Mr. Brazil claims that he never refused to go to New Orleans and would have been fine going to New Orleans with some reasonable accommodation from Volkert. The parties' briefs and supporting depositions are replete with discrepancies, inconsistencies, and differing interpretations of Mr. Brazil's and Volkert's conversations regarding Mr. Brazil's moving to the New Orleans project, and the court will not engage in a full recitation of every "he said" and "she said" with regard to these conversations. Suffice to say, Mr. Brazil and Volkert never came to an agreement about Mr. Brazil going to New Orleans and Mr. Brazil continued living in Birmingham and working on the Hernando project until Volkert terminated him.

Volkert claims that after Mr. Brazil flatly refused to go to New Orleans, he "attempted to justify remaining on the Hernando project," which was in fact winding down. (Doc. 13, at 5). Volkert has produced evidence that establishes that employees only charged 184 hours to the Hernando project from Mr. Brazil's termination in December 2010 until March 2012. (Doc. 13-7). Mr. Brazil asserts that Mark Jones, who worked on the Hernando project after Mr. Brazil's termination was "instructed to write no more than forty hours on his time sheets," and because of his fabrication in hours worked, Volkert's recorded time spent on the Hernando project is incorrect and does not accurately reflect the time spent on the project after his termination. (Doc. 17, at 7). The evidence that Mr. Brazil uses to support this contention is the December 16, 2010 memorandum from Mr. Bell to the Volkert Real Estate Services Staff that says, "Most of our projects should be to a point that would not require anyone to expend more than 40 hours per week. Effective today, no timesheets should be submitted containing overtime, unless that time has been approved by me in advance, in writing." ("Volkert Interoffice Memo," Doc. 18-4). This

memorandum does not support Mr. Brazil's contention that Mark Jones or any other Volkert employee was instructed to misrepresent any overtime worked on their timesheets, and thus the court accepts Volkert's 184 hours of recorded time on the Hernando project after Mr. Brazil's termination as representing the actual number of hours worked.  As of April 2012, the work on the Mississippi projects based out of Hernando was ongoing, and the files for those projects remain open.  Mark Jones, who replaced Mr. Brazil on the Mississippi projects, is still employed by Volkert and is still responsible for the Mississippi projects that he took over when Mr. Brazil was terminated.

Volkert asserts that Mr. Bell was facing pressure from his superiors at Volkert to reduce staff around the time Mr. Brazil was fired and that Mr. Bell made Mr. Brazil aware of the pressure he was facing before he asked Mr. Brazil to move to the New Orleans project. Volkert terminated ten employees in the Right of Way Department, including Mr. Brazil, from December 2007 to December 2010 for "lack of work." (Doc.13-8, at 4).  Six of the nine other employees terminated for "lack of work" were younger than Mr. Brazil and two of the six were under thirty-five. (Doc. 13-8, at 4).  Mr. Brazil asserts that one of those two employees, John Esalva, was hired as a trainee with little experience and "was just more of a gopher than anything." (Doc. 13-6, at 63).

After the back and forth between Mr. Brazil and Volkert about Mr. Brazil working on the New Orleans project, Mr. Brazil was terminated on November 17, 2010. At the time of his termination, Mr. Brazil was sixty-five years old. Mrs. Harmening called Mr. Brazil to tell him that Volkert was terminating him. The parties hotly dispute what Mrs. Harmening actually said to Mr. Brazil, but they *do not dispute* that at some point in the conversation she said, "younger

people are the future of the company." (Doc. 13-1, at 101). Mrs. Harmening testified that she did

not have a "clear memory" of what she told Mr. Brazil in that telephone conversation but that he

was fired "because he would not go where the projects were    . . . because he would not go to

New Orleans" and not " because of his age." (Doc. 13-6, at 80-81).  Mr. Brazil testified that Mrs.

Harmening told him that "he was being fired instead of employees like Mark Jones and Jon

Baker because '[w]e have decided that the future of the company is with younger employees.'"

(Doc. 17, at 4 (quoting Doc. 13-1, at 101-102, 107)).

        In Volkert's EEOC Position Statement, Mr. Bell specifically responded to Mr. Brazil's

allegations of discrimination by saying that "had [Mr. Brazil] been willing to work in New

Orleans and thereafter on the Shreveport or Dry Pong, Louisiana, projects, he would still be

employed by Volkert." (Volkert's EEOC Position Statement, Doc. 13-9, at 9). When asked about

this statement, Mr. Bell further testified that Volkert kept Mr. Brazil "busy for ten years," but

then "[t]he market dried up. We didn't have enough projects to continue to [employ Mr. Brazil]."

(Doc. 13-5, at 83). In a later conversation with Larson Edge, Mr. Bell reiterated that Volkert had

to terminate Mr. Brazil because Volkert did not have any work for him and because Mr. Brazil

would not go to New Orleans. (Doc. 13-5, at 97-98).

        Volkert asserts that as Vice President, Mr. Bell made the decision to terminate Mr. Brazil

and that although Mrs. Harmening was present when the decision was made, she was not the

ultimate decision-maker regarding Mr. Brazil's termination. Mr. Brazil admits that Mr. Bell was

the final decision maker for Volkert's employment decisions but points out that Mrs. Harmening

testified, "*I* fired him . . ." and "*I* know why [Mr. Brazil] was fired." (Doc. 13-6, at 81) (emphasis

added).  Mr. Bell testified that Mrs. Harmening "concur[ed]" and "participated" in the decision to

8

terminate employees at Volkert. (Doc. 13-5, at 16)

      B.    <u>Administrative and Procedural History</u>

Mr. Brazil filed a charge of age discrimination with the EEOC within 180 days of the

occurrence of the last discriminatory act by Volkert and then timely filed this lawsuit on

November 17, 2011, within 90 days of receiving his Right to Sue letter from the EEOC.

Mr. Brazil's Complaint contains two counts against Volkert: Count I alleges age

discrimination in violation of the ADEA for his termination and Count II alleges failure to pay

overtime in accordance with the FLSA. (Doc. 1). After discovery, Volkert filed a Motion for

Summary Judgment on both of Mr. Brazil's claims. (Doc. 13). The parties have fully briefed the

motion, and the court now considers it.

## II.    <u>STANDARD OF REVIEW</u>

Summary judgment allows a trial court to decide cases when no genuine issues of

material fact are present and the moving party is entitled to judgment as a matter of law. *See*

Fed. R. Civ. P. 56. When a district court reviews a motion for summary judgment, it must

determine two things: (1) whether any genuine issues of material fact exist; and if not, (2)

whether the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56©.

The moving party "always bears the initial responsibility of informing the district court of

the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any,' which it believes

demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S.

317, 323 (1986) (quoting Fed. R. Civ. P. 56). The moving party can meet this burden by offering

evidence showing no dispute of material fact or by showing that the non-moving party's evidence

fails to prove an essential element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322–23.  Rule 56, however, does not require "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." *Id.*

Once the moving party meets its burden of showing the district court that no genuine issues of material fact exist, the burden then shifts to the non-moving party "to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). Disagreement between the parties is not significant unless the disagreement presents a "genuine issue of material fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).   In responding to a motion for summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material fact."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The non-moving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a *genuine issue for trial*.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)) (emphasis added); *see also* Advisory Committee Note to 1963 Amendment of Fed. R. Civ. P. 56(e), 28 U.S.C. app. ("The very mission of summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.").  The moving party need not present evidence in a form admissible at trial; "however, he may not merely rest on [the] pleadings." *Celotex*, 477 U.S. at 324.  If the evidence is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (citations omitted).

In reviewing the evidence submitted, the court must "view the evidence presented

10

through the prism of the substantive evidentiary burden," to determine whether the nonmoving

party presented sufficient evidence on which a jury could reasonably find for the nonmoving

party.  *Anderson*, 477 U.S. at 254; *Cottle v. Storer Commc'n, Inc.*, 849 F.2d 570, 575 (11th Cir.

1988).  The court must refrain from weighing the evidence and making credibility

determinations, because these decisions fall to the province of the jury.  *See Anderson*, 477 U.S.

at 255; *Stewart v. Booker T. Washington Ins. Co.*, 232 F.3d 844, 848 (11th Cir. 2000); *Graham v.

State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999).

Furthermore, all evidence and inferences drawn from the underlying facts must be viewed

in the light most favorable to the non-moving party.  *Graham*, 193 F.3d at 1282.  The nonmoving

party "need not be given the benefit of every inference but only of every reasonable inference."

*Id.*  The evidence of the non-moving party "is to be believed and all justifiable inferences are to

be drawn in [its] favor."  *Anderson*, 477 U.S. at 255.  After both parties have addressed the

motion for summary judgment, the court shall grant the motion *if* no genuine issues of material

fact exist *and if* the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.

III.    ANALYSIS

A.    ADEA Claim

The ADEA makes it "unlawful for an employer to fail or refuse to hire or to discharge

any individual or otherwise discriminate against any individual with respect to his compensation,

terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. §

623(a)(1). As the Supreme Court has stated:

> [w]hen a plaintiff alleges disparate treatment, liability depends on whether the
> protected trait (under the ADEA, age) actually motivated the employer's decision.
> That is, the plaintiff's age must have actually played a role in the employer's

11

decisionmaking process and had a determinative influence on the outcome.

*Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 141 (2000) (internal marks and citations omitted).

     1.    <u>Direct Evidence</u>

If a plaintiff presents direct evidence that his employer unlawfully discriminated against him, then summary judgment is inappropriate and the burden of persuasion at trial should shift to the defendant to prove by a preponderance of the evidence that it would have made the same decision without the discriminatory motive. *Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 641 (11th Cir. 1998). The Eleventh Circuit defines direct evidence as "'only the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of some impermissible factor.'" *Akouri v. State of Fla. Dept. of Transportation*, 408 F.3d 1338, 1347 (11th Cir. 2005) (quoting *Carter,* 132 F.3d at 641). Mrs. Harmening's comment to Mr. Brazil when she terminated him that "younger people are the future of the company" is not so blatant that the court considers it direct and conclusive evidence of age discrimination, but it does qualify as circumstantial evidence of impermissible age discrimination.

     2.    <u>Circumstantial Evidence</u>

In the absence of direct evidence of discrimination, the court applies the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), to analyze ADEA claims based on circumstantial evidence of discrimination. Under the *McDonnell Douglas* framework, a plaintiff must first establish a prima facie case of age discrimination by showing that: "(1) he was a member of the protected group of persons between the ages of 40 and

70; (2) he was subject to adverse employment action; (3) he was qualified to do the job; and (4)

he was replaced by a younger individual." *Chapman v. Al Transport*, 229 F.3d 1012, 1014 (11th

Cir. 2000) (citing *Benson v. Tocco, Inc.,* 113 F.3d 1203, 1207-08 (11th Cir. 1997)).

The Supreme Court clarified that "[t]o establish a disparate-treatment claim under the

plain language of the ADEA, therefore, a plaintiff must prove that age was the 'but-for' cause of

the employer's adverse decision." *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167, 176

(2009). The Eleventh Circuit has held that the *Gross* standard applies within the *McDonnell*

*Douglas* framework:

> because the but-for causation standard of *Gross* is consistent with the *McDonnell*
> *Douglas* framework where the burden of persuasion to show discrimination remains
> at all times with the plaintiff, we will apply the *McDonnell Douglas* framework to
> determine whether [the plaintiff] established a prima facie case that age
> discrimination was the but-for cause of his adverse employment action.

*Horn v. United Parcel Services, Inc.*, 433 F. App'x 788, 793 (11th Cir. 2011) (citing *Gandara v.*

*Bennett,* 528 F.3d 823, 829 (11th Cir.2008); *Gross,* 557 U.S. 167; and *McDonnell Douglas,* 411

U.S. 792).

Mr. Brazil meets all four elements of a prima facie case of discrimination under the

ADEA: (1) Mr. Brazil was sixty-five years old when he was fired; (2) Volkert's termination of

Mr. Brazil's employment constitutes an adverse employment action; (3) Mr. Brazil was qualified

as a Real Estate Specialist/ Right of Way Consultant; and (4) Mr. Brazil was replaced by Mark

Jones, who was thirty-eight years old when Volkert terminated Mr. Brazil. (Doc.13-8, at 3).

Mr. Brazil also raises a genuine issue of material as to whether "age was the 'but-for'

cause of the employer's adverse decision," *Gross*, 557 U.S. at176.  In *Mora v. Jackson Memorial*

*Foundation, Inc*, the Eleventh Circuit vacated the District Court's entry of summary judgment for

13

the defendant because "a reasonable juror could find that [the defendant's] statements should be taken at face value and that he fired Plaintiff because of her age." *See Mora v. Jackson Memorial Foundation, Inc.*, 597 F.3d 1201, 1205 (11th Cir. 2010). The defendant in that case told the plaintiff when he was firing her that he "need[ed] someone younger I can pay less," but claimed that he fired the plaintiff solely for poor job performance. *Id.* at 1203. Similarly, in this case, Mrs. Harmening's statements to Mr. Brazil provide "sufficient evidence of a discriminatory motive which was the 'but for' cause of Plaintiff's dismissal." *Id.* at 1204.

Under *McDonnell Douglas*, after the plaintiff has established a prima facie case of discrimination, the employer must offer a legitimate, nondiscriminatory reason for the adverse employment action. *Mitchell v. USBI Co.*, 186 F.3d 1352, 1354 (11th Cir. 1999). If the employer provides a legitimate reason for the employment action, the plaintiff bears the ultimate burden of demonstrating that the employer's proffered reasons are a pretext for discrimination. *Id.*

Here, Volkert claims that a severe work shortage led to Mr. Bell's decision to terminate several employees, including Mr. Brazil. Mr. Brazil claims that Volkert's articulated reason is pretext for discrimination. At the summary judgment stage, Mr. Brazil's claim "depends on whose account of the pertinent conversation a jury would credit," with the pertinent conversation being Mrs. Harmening's comments that Mr. Brazil was being fired because the future of the company was with younger people. *See Mora*, 597 F.3d at 1204. When the resolution of the case depends on the credibility of witness' testimony, the court should not grant summary judgment. *Id.* This court finds that "a reasonable juror could accept that [Mrs. Harmening] made the discriminatory-sounding remarks and that the remarks are sufficient evidence of a discriminatory motive." *See id.*

Drawing all inferences in Mr. Brazil's favor, genuine issues of material fact exist on the record about whether Volkert discriminated against Mr. Brazil, and the court will DENY summary judgment on Count I.

B.      FLSA Claim

Mr. Brazil claims that Volkert willfully violated the FLSA by failing to keep adequate records reflecting the time it permitted or required Mr. Brazil to work in excess of forty hours per week and required him to work in excess of forty hours per week without paying him any overtime compensation. Volkert claims that Mr. Brazil is not entitled to overtime pursuant to the administrative exemption.

The FLSA generally requires that employers pay their employees time and a half for any time an employee works in excess of 40 hours a week. 29 U.S.C. § 207(a)(1); *Alvarez Perez v. Sanford-Orlando Kennel Club, Inc.*, 515 F.3d 1150, 1156 (11th Cir. 2008). However, these overtime provisions do not apply to all employees; the FLSA exempts from its minimum wage and overtime requirements "any employee employed in a bona fide . . . administrative. . . capacity" 29 U.S.C. § 213(a)(1). An exempt administrative employee is one

(1) Compensated on a salary or fee basis at a rate of not less than $455 per week;

(2) Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and

(3) Whose primary duty includes the exercise of discretion and independent judgment to matters of significance.

29 C.F.R. § 541.200. Furthermore, "[t]he phrase 'directly related to the management or general business operations' refers to the type of work performed by the employee. To meet this

15

requirement, an employee must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from . . . selling a product in a retail or service establishment." 29 C.F.R. § 541.201(a). Such work includes, but is not limited to, quality control, purchasing, procurement, safety and health, personnel management, labor relations, public relations, and similar activities. *Id*. 541.201(b).

The parties strongly contest the existence of the second and third elements of the administrative exemption.  As previously stated, Volkert asserts that Right of Way Consultants and Real Estate Experts exercised a great level of independent authority and discretion over the day-to-day operations of their assigned relocation projects and that Mr. Brazil's supervisors had little to no involvement in his day-to-day operations at the project sites.

Mr. Brazil, however, argues that he enjoyed little discretion because nearly all of his decisions, no matter how significant or trivial, were determined by the URA's guidelines and regulations and by Relocation Manuals issued by Volkert's clients, the Mississippi and Alabama Departments of Transportation.  Mr. Brazil also claims that every aspect of his work was overseen by Volkert's clients and this "micro-management required resubmission of nearly all relocation claims." (Doc. 17, at 26).

In deciding whether an employee is exempt under the administrative exception, the ultimate question is "whether the employee has the ability 'to make an independent choice, free from immediate direction or supervision.'" *Rock v. Ray Anthony Intern., LLC,* 380 F. App'x 875, 879 (11th Cir. 2010) (quoting 29 C.F.R. § 541.202©). Making all inferences in Mr. Brazil's favor, reasonable minds could differ on the degree of discretion and independent judgment exercised by Mr. Brazil on a daily basis as a Real Estate Specialist. The parties have presented

16

evidence that creates genuine issues of material fact about whether Mr. Brazil's job "involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered."  29 C.F.R. § 541.202(a).

Because genuine, and hotly contested, issues of material fact exist as to the extent of Mr. Brazil's independent judgment and discretion as a Real Estate Specialist when viewing the evidence in the light most favorable to the nonmovant, the court cannot grant summary judgment for Volkert under the Administrative Exemption. Thus, the court will DENY summary judgment on Count II.

IV.   CONCLUSION

Mrs. Harmening's comment that the future of Volkert was with younger people in itself creates a genuine issue of material fact on Mr. Brazil's claim of age discrimination under the ADEA. Volkert and Mr. Brazil's differing characterization of the discretion and independent judgment necessary as part of Mr. Brazil's job as a Real Estate Specialist also creates a genuine issue of material fact as to whether Mr. Brazil is exempt from overtime wage requirements under the FLSA.  Because genuine issues of material fact exist in the case, the court will DENY Volkert's motion for summary judgment.

DONE and ORDERED this 19th day of November, 2012.

KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE